with 24-3207 Duke v. Waxakata. Thank you. And just one second, let me get my screen up here. Of course. All right. Attorney Blumenfeld. Good morning, Your Honors, and may it please the Court, my name is Jeremy Blumenfeld and I represent the Luxottica Defendant's appellants in this matter. Your Honors, Judge Azraq's original ruling dismissing plaintiff's claims under 29 U.S.C. 1132a2 for relief on behalf of the plan was correct, and the reconsideration order reversing in part aspects of that ruling and allowing that claim to proceed in court was wrong for three reasons. First, plaintiff here lacks Article III standing to press claims on behalf of the plan under 1132a2. To start, the reconsideration order decision on Article III standing is fundamentally inconsistent with Supreme Court Article III jurisprudence and Supreme Court and Second Circuit precedent about the distinction between claims under a2 of the statute and claims under a3 of the  Can you help me sort of understand why the question of whether plaintiff can invoke 502a2 on the basis of the allegations that she's made, why that's a standing question rather than a merits question? Just let me give you an example. I bring a breach of contract claim, but in fact there wasn't a contract. There just was no meeting of the minds. There was never a contract. A court's not going to dismiss me and say you lack standing to pursue a breach of contract claim. They're going to say, well, you have standing because that's the allegation you've made, but the relief that you seek isn't warranted on the merits, and therefore we dismiss you on the merits. A couple of reasons, Your Honor. First, if you look at the Supreme Court's decision in Thole v. U.S. Bank, the Supreme Court said no Article III standing in that case involving the same statutory provision, 1132a2. Okay, but the question the court asked wasn't whether relief was available under the statute. It asked whether there was injury in fact and whether it was redressable as alleged. Well, but redressability is part and parcel to the remedy that is at issue in the case, and if you look at our reply brief pages, page 10, we cite to a Seventh Circuit case and an Eleventh Circuit case and a D.C. Circuit case and the Steele Company case, each of which said for redressability to be a meaningful element under Article III, it has to be a remedy that you're actually entitled to under the statute. So, for example. Yeah, go ahead. I mean, because that sounds to me like you're saying in order to have standing, you have to have a valid claim on the merits. Not a valid claim, but it has to be a remedy that's available to you. So, for example, in a statute, if you're suing and the statute only allows injunctive relief, you can't claim Article III standing and redressability by seeking monetary damages. And the flip side is also true. If a statute only authorizes monetary damages, you can't say I want an injunction to stop the behavior when the statute doesn't authorize it. Okay, but you can say I want monetary damages, and if it turns out you're absolutely not entitled to them, that's not a standing issue. And here, they say, correctly or not, that the allegations they make about systematic problems with the plan's calculations are causing lower benefits, and they seek, whether they're entitled to or not, reformation under A2. Why aren't they seeking? Why isn't the government or what they're seeking? I know you're just dying to hear. I will let you answer. But why isn't that a merits question? That's no different, Your Honor, than a plaintiff coming into court and saying, I want monetary damages under a statute that only authorizes injunctive relief and says, well, I want to get my monetary damages. You would not say that person has a claim. Well, if the person has a theory as to why there's an implied right of action for damages under that statute, we would evaluate that theory as a merits question, not as a standing question. If the remedy is potentially available, maybe, Your Honor. And if you look at the Sewell case, this court talked about that issue in that context when it involved the merits. But if you look at the Supreme Court's decision, for example, in the Steel Company case, it was exactly the example I was just giving. So the plaintiffs in that case sought a bunch of different remedies under different statutes, and the Supreme Court did, as you're supposed to do, look at each claim and each category of relief. And one of the categories of relief that the plaintiffs sought in that case was money. And they sought money based on expenses they incurred unrelated to the litigation. And as it turns out, the statute they were suing under allowed damages for litigation expenses but didn't allow damages for damages incurred unrelated to the action. And the Supreme Court said that meant they failed the redressability problem because the statute they were suing under did not afford them the remedy that they were seeking. Can I ask just to separate out the reformation remedy from the monetary penalties remedy? So just starting with reformation, which Judge Robinson was asking about, I think. Here's a simple way of looking at it. Tell me why it's wrong. ERISA requires an equivalency between the single life and the joint survivorship annuity. Duke's claim is there's not an equivalency because of the outdated actuarial model and conversion that's being done. So alleges my benefits now are at one level. Reform the plan to not be in compliance with ERISA's equivalency requirement. My benefits will go up. Just on reformation, that just seems pretty straightforwardly a redressable injury. That's not a redressable injury under A2 of the statute. You have to look at each claim and each category of relief. Reformation is a remedy under A3 of the statute, as the Supreme Court said in Verity, as the Supreme Court said in Cigna v. Amara, and as this Court said most explicitly in Laurent v. Price Waterhouse. And in Laurent, this Court said, likewise in Verity, that it's a remedy under A3 because it's not a remedy available under other provisions of the statute. But isn't there an overlap in the remedies between A2 and A3? Doesn't A2 also call for equitable relief? And isn't equitable relief pretty broad? It calls for equitable relief, but equitable relief is not broad because it has to be equitable relief to the plan, not equitable relief on behalf of participants. Equitable relief to the beneficiaries of the plan would include if, assuming the plan was using, trustees were using the wrong actuary figures, would include using the correct ones. And I would submit, Your Honor, when you say to the beneficiaries of the plan, that's the distinction between an A3 claim and an A2 claim. I get that A3 is an individual beneficiary, but A2 allows a beneficiary to bring a claim, does it not, on behalf of the plan as a whole. And so if there's an overlap in remedy, then it seems the distinction you've been arguing is a distinction without meaning. There isn't an overlap in the remedies because there can't be, because A3 only provides a remedy where A2 does not provide that remedy. Well, when you say individual, there's a distinction. I read that section to be broader. I'll have to find the section, but I read the remedy to be broader than that. If you look at the Supreme Court's decision in Russell, it addresses that language you're talking about at the end of the statute where the statute says, or other remedial or equitable relief. And the Supreme Court in Russell said that doesn't mean equitable or remedial relief at large. It means equitable or remedial relief to the benefit of the plan. And if you look at Verity Corp. and Signicorp, Viamara, and Laurent, those all involved the exact same allegations. Laurent involved an alleged violation of actuarial equivalence requirements. And those were claims under A3 of the statute, not A2. If we follow your logic, then who can bring a claim under A2? No beneficiary could ever bring a claim under A2. Well, so the Supreme Court in the Thole case addressed that precise question. Well, somebody with injury in fact. That's why Thole is different from this case, no? But no, because the injury in fact has to be an injury that would be addressed by relief to the plan. Which it wasn't in Thole because they would get the same amount of money regardless. The claim there was you're not investing the money properly. Here it's a different kind of claim. Shouldn't we look at that distinction? It's a claim under A3 of the statute. And the Supreme Court in Thole addressed that precise type of claim. No, no, no, no. My question is how does Thole apply here when in Thole the court specifically said you won't get any additional money regardless of how the funds are invested. But here the claim, the allegation is that beneficiaries, including the named plaintiffs, would get additional funds. So it's different. And I'm trying to understand why Thole governs given that key distinction. The Supreme Court addressed that hypothetical that you're talking about in the discussion. It said if the plaintiffs, quote, had not received their vested pension benefits, they would, of course, have Article III standing to sue and a cause of action under other provisions of ERISA. In that case it was ERISA Section 5021B to cover the benefits due them. But it can't be that every time a participant's benefits are underpaid that's also a claim on behalf of the plan for a remedy to the plan and an injury to the plan. No, but the claim is that the plan is violating ERISA by failing to meet the actuarial equivalence. Reformation as a remedy would resolve that claim. I mean, there's a sort of merits argument about that that fades into your Stilco 1331, which I can't say I'm persuaded by. So setting that aside, if I'm not persuaded by that, then reformation would be based on a claim that the plan is harmed and reformation would bring benefit to Duke. And so standing. And I see that as distinct from the monetary penalties claim. There I think you're under fool. So let me address the reformation issue because I think you articulated it in exactly the right way in terms of the question, Your Honor. And that's you said the plan has been harmed by the use of these unreasonable factors. But that's not true. There is no injury to the plan from the use of unreasonable actuarial factors. In fact, the plan, to the extent it is impacted by it, it benefits by it. The argument that the plan is not complying with the act. Well, the allegations are it could have liability and tax implications and things like that. And maybe that's wrong and maybe that's right, but that's a merits question. But there are no allegations in the complaint that the plan is not funded in accordance with ERISA's requirements. Those are separate funding requirements. No, yeah. There are. It claims it's underfunded as a result of this faulty actuarial equivalence. But ERISA has these specific funding rules that apply. But to get back to reformation. But that's right, right? I mean, that's. ERISA has funding rules. The complaint alleges that the employer didn't contribute as much as. Therefore, it's underfunded. That's different because the plan assets are managed. And so the plan could be over 100% funded, notwithstanding whatever the employer contributes to the plan. Isn't part of the relief they're seeking that additional funds be put in once. If they prevail on the merits of the claim and the wrong actuary figures are used, then the plan. Their claim is that the plan should be adequately funded to refund the beneficiaries what they were underpaid. And to fund it adequately to cover the proper actuary. This is, again. If they succeed on the merits. This is, again, where Thole controls. Thole says putting money into the plan in the context of a defined benefit plan does not have an impact on participants' benefits. And that's because it's a defined benefit plan. If it doesn't result in the beneficiary getting additional money, then that's not injury in fact. But the remit, you need Article 3 standing for each category of relief. Even if these plaintiffs were entitled to additional money. That would have no impact on the plan's funded status or the obligation to contribute money to the plan. Conversely, contributing more money to the plan. If the defendants in this case contributed another $100 million to the plan. That has no impact on any participant's benefits, let alone plaintiff's benefits. What would is reforming the plan terms. But reforming the plan terms does not help the plan. And to the extent that you're saying the plan is not in compliance with ERISA. That was the dissent's argument in the Thole case. The dissent made that precise argument. But that wasn't the majority. But there, I think like with the monetary claim, relief sought here. So I think I'm with you on loss restoration and disgorgement precisely because of Thole. Because it's defined contribution and not benefit. That I see. But the reformation, and again, I understand that you're making sort of a, I think it's so without failure to state a claim, you reach a Steel Co. 1331 problem. But if I'm not with you on that, then I think you're just making a merits argument as to harm to the plan. And redressability, I think, is met by reformation of the plan with respect to the plaintiff. Let me, if I may, switch gears and try and convince you about something else. If you look at this court's decision en banc in the Sole case, or Sole case, S-O-U-L-E, I believe, this court addressed Article III standing on two issues. One was injunctive relief. And this court said that the plaintiff in that case had Article III standing to seek injunctive relief to change her own records, her own athletic records, but no Article III standing to change the records of other athletes. So let me ask, assuming we're all seeing where you're going with that, maybe I might want to give you your next sentence, and then I want to talk about it. I was just going to say you apply that same logic here, and the plaintiff has Article III standing to seek to change her plan records, her plan benefits, but not others. Okay, so I take it your position is that 502A3 authorizes the reformation that she seeks as a remedy. You're not going to show up in arbitration and say, oh, no, that's not available. That's correct. This court has said that in a number of cases as well. Okay. But your position, I gather, is it's only a remedy as an individual remedy. One of the things that I'm scratching my head about, not being an ERISA expert like you all are, is that I thought that if you had a plan, you couldn't apply one set of actuarial assumptions to one individual and their joint survivor benefit plan, but not to others in the plan. Are you telling me that it would be allowable under ERISA to have some members, namely those who bothered to seek arbitration, have their benefits calculated one way but others calculated a different way? Yes, Your Honor, and to start, as the complaint notes here, the plan assumptions in this case changed as of a point in time, and so there are already participants whose benefits are being calculated under different sets of actuarial assumptions, and if plaintiff sued and prevailed, she could get some remedy under ERISA that would be applicable to her and not applicable to others, and there's nothing improper or untoward about that under ERISA. It might require reformation of the plan terms as to her and not others, but that's no different than people suing. Wouldn't it require application of the same principles to others that were similarly situated? Because I understand that in terms of actuary, and I don't, because I'm less of an expert than perhaps even my colleagues who've written on this ERISA, but wouldn't it, isn't it governed by sort of points in time or dates in time, not individually driven? So typically when a plan is amended, it will apply to certain categories of employees, not other categories of employees, but there's nothing that requires that, and in fact there are programs that employers offer, for example, to say, we're going to offer this small subgroup of individuals a particular benefit formula and a particular window where they can get an enhanced benefit, and it might be a universe of one or two or three people. But it's offered in a non-discriminatory way. An employer couldn't come in and say, hey, I really want to incentivize you to work for us. I'm going to give you a special deal, but don't tell anybody because you're still in the plan with everyone else, but we're going to calculate you differently. So you could amend a plan to provide a special benefit to a particular individual, even by name, and there are plans that do that. What you couldn't do is discriminate in favor of highly compensated employees. Okay, but what you just described was amending the plan, and so I guess what to carve out certain individuals, and I'm going back to this understanding how the relief would work under A3. I guess the amendment, the reformation would be an amendment of the plan to carve out the individual plan. For the individual that you're talking about that's in question in that case, and I think that would be consistent with the Sewell case on precisely that issue. And I would also point out, Your Honor, when it comes to the arbitration question, the district court's ruling denying the motion to compel arbitration was not based on sort of contractual principles. It was based on the effective vindication doctrine. And so if I'm right and she has the ability under A2 of the statute, consistent with Article III of the Constitution, to seek reformation, that is an injunction like in Sewell, to change her own benefits, but she doesn't have Article III standing to seek reformation of the plan for other plan participants per Sewell, then there's no reason she couldn't arbitrate her A2 claim seeking the same relief that she's already arbitrating on her A3 claim. There's no effective vindication problem. Yeah, no, and this goes back to the same challenge I have with the standing conversation. Are we really talking about standing or are we really talking about the merits? And I feel like that's the arbitrability version of that question, right? The question of whether this is relief that can be attained through a 50382 action, that seems to me to be not arbitrable under Cedeno. But whether or not the answer is, you know, if the answer proves to be no, you can't, then you're litigating in court a claim there. They're litigating in court a claim that they lose. But I would say, Your Honor, in the Sewell case, the ombud court said a plaintiff has Article III standing. Putting aside statutory issues, a plaintiff has Article III standing to seek an injunction to change their own records, but not to change the records of others. So under Sewell- Right. I mean, all of this, every single one of these arguments circles back to this core question, it seems to me, of whether the injury that's being alleged, the underfunding relative not to the plan's own terms or relative to the sort of statutory expectations of what the terms would be, is an injury. It either is an injury to the plan, in which case you lose, or it's not an injury to the plan. I'm sorry, in which case you win. Well, except for the reformation piece. Right. Is injunctive, is effectively a kind of injunctive relief, right? Change the plan terms and pay the benefits pursuant to the reform plan. Sewell considered that not in the context of ERISA. This has nothing to do with whether 502A2 allows the remedy. This has to do with plaintiff has Article III standing to seek that remedy beyond as it applies to herself. And that's not a Cedeno question. That's a question about Article III standing that Sewell addressed in a different Article III context. But there's no reason that Article III principles don't apply here the same way they do in other contexts. It seems to me that you're describing injury to the plan in a weird way. And help me understand, and maybe I'm missing the point. This is a weird hypothetical. But let's say a beneficiary says, you know what, the actuary figures they're using, they're wrong. But they benefit me. Because I'm getting, instead of getting, in this case, I'm getting $60 or whatever less than I should, I'm actually getting $100 more than I should. And there are a whole lot of people getting $100 more than they should. In that case, would your answer change if that person sued and said, you know what, you're giving me too much money. And, you know, it's great now, but, you know, I'm on this special vitamin. I'm going to live until 120. Therefore, I don't want the plan to lose money because you're giving out more than you should. Would there be an injury to the plan then? So I'm going to give you the lawyer answer, which is yes and no. The answer to your specific question is yes, there is an injury to the plan in that context. But not in the other context? Yes, the plan benefits in the other context. Absolutely. And, in fact, there are lawsuits where plan fiduciaries sue. Well, benefits until, you know, someone comes along and says you're violating the statute. But that doesn't matter. That's the statutory cause of action, not the statute. But if you can explain to me how under one scenario the plan is injured but not under the other. In the one scenario that you were describing, the plan paid out more than it was supposed to. I thought you do think factually that's the case. Here? Yeah. No, the plan paid out exactly what it was supposed to to these plaintiffs. To this plaintiff. You contend factually. This is a little bit of a sidebar. But you contend factually that the change that plaintiff seeks would harm her. Oh, as a factual matter, yes. So therefore the plan is paying out too much now? But she says to the contrary. And that has to do with that's the factual challenge to Article III standing, Your Honor, that's not in this appeal. It has to do with what's the starting point for the calculation. That's a merits question. Would the answer to this hypothetical be the same if the challenge was you're paying too much relative to what the terms of the plan require you to pay versus you're paying exactly what the terms of the plan require you to pay but we think that it's too much relative to the extrinsic statutory framework? Or is it the same answer? I think if the question is has the plan been injured, and you can say the plan is paying out more than it's supposed to, and the cases that I was talking about that actually exist are cases in which a plan is paying out not because of actuarial assumptions but for other reasons, paying out more in benefits than it's supposed to, there are definitely lawsuits that are brought in that context. And if the plan has been injured, then that's an injury that is cognizable under the statute. Okay, so why is that an injury but not in the context when the plan is underpaying? That's what I'm struggling with. So I think it's very simple. Does the plan have more or less money than it's supposed to? And if the plan paid out more money than it was supposed to, then the plan has been injured. If the plan didn't pay out more money than it was supposed to, then the plan has not been injured. If I may, the question you asked also in the example of a participant who was receiving more in benefits than they were supposed to, that participant would not have Article III standing in the same way that under Thole, those participants didn't have Article III standing to press that claim. So you need a statutory standing and Article III standing. In the example you proposed, there would be a statutory standing. I agree with you on that because they're getting more than they should, but I'm not sure. Well, no, because the essence of their claim isn't you're paying me too much. That's not the injury that's bringing them to court. The injury that's bringing them to court is a systemic harm to the plan that ultimately harms the security of their own. So depending on how imminent that is, they certainly could come in, it seems to me, as a matter of Article III. Well, so this is – Thole talks about this precise issue and says you need not just that the plan be underfunded, but so underfunded that it puts their benefits at risk. Right. Correct. Then I would agree with you in that circumstance. We don't have any allegations. And that was my hypothetical, that the person would live until 120, and then there wouldn't be enough money left. So I don't think that would satisfy the imminence requirement or the immediacy requirement. The plaintiffs in Thole and the amicus in Thole tried to suggest that that was the circumstance there, and the Supreme Court said you've got a host of problems, including also the PBGC protection that would get in the way at that point in time. And obviously we're not talking about that here, but I want to be responsive to your hypothetical. Could I just – I just – one with the presider's indulgence. Just to clarify, with respect to the arbitration, your view is there is no way for Duke to obtain relief for the plan in arbitration under the agreement? She could only get it for herself. She can't get relief, for example, reforming the plan for other participants? Is not relief that she could get in arbitration. And under the Sol or Sole case, that's also not relief she can get in court because she wouldn't have Article III standing. But so I think given that answer, if I disagree with you on standing, then that's, I think, a concession that the effective vindication conclusion is correct on A3. I don't – I don't think so. I'm sorry. On A2. Because if she can't in arbitration get relief for the plan. So I would need to understand what relief you're talking about. Because if you're talking about money to the plan, I think you and I talked about that, and that's Thole. And if you're talking about reforming the plan for other people, that's – she has that same obstacle in court. Because she has an Article III problem seeking that remedy in court under the Sol or Sole opinion. But the question as I understood it was, assuming we disagreed with you on whether she had standing to bring that claim on behalf of other plan beneficiaries under A2, would you then agree that if she had standing, she could get the relief of reformation of the plan for all beneficiaries? If she had standing and there was an – and that was a cause of action available for reforming the plan terms, I would agree that that's not a remedy that she could get under A3 in arbitration. And so I think that answers your question perhaps about the effective vindication doctrine. But could get it under A2 if we disagreed with you. If you find that she can get relief under A2 that she can't get under A3 that is beyond her own personal relief, then that's an effective vindication issue. In which case, I would say, Your Honors, and I know I'm over time, the A2 and A3 issues overlap on all of the substance. You know, we're talking about some remedy issues, but all of the substance between the A3 claim and the A2 claim relate to how were her benefits calculated? What do 29 U.S.C. 1053, 1054, and 1055 require? And if her benefits weren't calculated in accordance with those statutes, by how much? Those are all the same issues that would need to be adjudicated in arbitration on the A3 claims as would be under the district court. So let me ask you, maybe this isn't a fair question and I'll preface that you can not answer it. Let's assume you were not successful here and the A2 claims continued. Would you then for that logic seek a stay of the arbitration proceedings that apparently are ongoing as to A3? So no, we would not. And in fact, the plaintiff never initiated those arbitration proceedings, but plaintiff in the district court said. So they're not ongoing? I don't know if that's appropriate to ask, but I have questions for your opponent on that issue. But there are no arbitration proceedings because they didn't initiate them as ordered by the court. But if those proceedings were litigated in both forms, we would not seek a stay of the arbitration. In fact, in the district court, plaintiff said you should stay the arbitration proceedings pending the resolution of the A2 claims in court because it might moot entirely the A3 claims. And I would say that that's exhibit one. That is the evidence that this is a problem and that's exactly the wrong way to proceed. Because when parties agree to proceed in arbitration, you can't litigate claims in court that are going to moot those things. That's the McCowan versus Sears case. Well, but there are cases that say you can have parallel proceedings, right? You can, but. And that's discretionary within the court. And maybe I should ask our presider, I should not keep going with these questions. But I am concerned that yet I could understand your argument about the overlap. It all seems to get to the issue of the proper actuary tables, whether there's a violation or not. But it seems to me the remedy is the issue, right? Whether she's entitled to seek. We disagree with everything that is alleged in the complaint about the lawfulness. No, I understand that. And I get that. And I'm not trying to suggest that you don't. And McCowan suggested, not suggested, held that this was a mandatory Federal Arbitration Act Section 3 stay, not a discretionary stay. If the claim was arbitrable. No, McCowan involved some claims that were arbitrable and other claims that were not. But they involved similar elements. And what mattered in McCowan was that it was the same party seeking to compel arbitration and seeking the stay of arbitration. In some of the other cases that plaintiff has cited, and in some of the cases subsequent to McCowan, there have been circumstances where there's another party involved. And that other party has a discretionary stay question, not a mandatory stay question. Okay, I think I'm going to jump in if that's okay. And we'll have a chance to hear from you again. So thank you. Thank you very much. We'll hear from Attorney Pata. May it please the Court. Regina Pathak for Appellee Janet Duke. Your Honor, the district court here correctly invalidated the arbitration clause because it entirely eliminates the ability of any ERISA participant to assert a representative claim under 1132A2 and to seek any remedy on behalf of the plan as authorized by 1109. The district court also correctly declined to issue a mandatory stay against non-arbitrable claims. I need to begin with standing, I think, Your Honors, and address why I think here standing doesn't offer a basis for reversal in this case. I think the question of whether you have to reach standing is potentially a complicated question, but I certainly think you can reach the standing question. And I think here standing is easily satisfied for at least one remedy under 1109, which means you have to reach the effective vindication ruling. But I think that, in fact, Duke has standing to obtain all of the remedies that she's seeking, including loss restoration. I want to begin, though, with just the simple, I think the simplest version of the remedy that we're seeking, which is an injunction against application of illegal plan terms. Okay, so one of the things that, and let's put aside the question of whether this is a standing conversation or merits conversation because I think that can take us down a different road. But the nut of the argument that I understand it is, look, there is a difference between an injury to the plan that calls for relief to the plan and injury to all of the plan's beneficiaries that calls for plan-wide relief on behalf of the beneficiaries, right? Now, I think what you're saying is they're one and the same. Am I overstating your case? I think, Your Honor, that might be slightly overstating the case. Okay. And I just want to back up for one minute. I'm happy to set aside the distinction between standing and merits, but I do think it's important to note that in Steel Co., the Supreme Court made very clear that to the extent that you, because of jurisdictional concerns, are going to venture into questions of whether we are entitled to seek a remedy under A2, you only need to be persuaded that our claim is non-frivolous. And I think that is a very easy bar that we satisfy for every single remedy that we're seeking, and that bears on the question you're asking, which is do we have a non-frivolous argument that there is a benefit, that there's an appropriate benefit to the plan, or rather that we are seeking to remedy an injury to the plan. How is the plan harmed by that? The injury to the plan, Your Honor, is that violation of the actuarial equivalence requirements means that the plan is out of compliance with ERISA, as well as with the parallel provisions of the Internal Revenue Code, which threaten the plan's tax-qualified status. When a plan is being administered illegally and it has an illegal plan term in it, that threatens the plan. That is a harm to the plan. So there are a lot of provisions in the statute books governing how ERISA plans are governed, and I want to make sure I understand, because it seems like the implication of your – in order to be a 50382 claim, it's got to be a breach of fiduciary duty under 1109. And so I think what you're saying is any time you are violating one of those provisions in a way that leaves the plan out of compliance with either federal ERISA law or tax law, then you're breaching a fiduciary duty and it's a harm to the plan that needs to be remedied on behalf of the plan. Am I – So, Your Honor, I think you have to separate the question of whether there's a fiduciary breach from whether or not the A2 claim is properly seeking a remedy that flows to the plan. Not every single violation of ERISA is going to be a fiduciary breach. Well, but 50382 is only about breaches of fiduciary duty, right? That's exactly right, Your Honor, and that's why A2 – I think my friend characterizes our position about A2 as being incredibly broad and allowing for any possible violation of ERISA to be swept within it, but that's not true. A2 claims are claims where there is a breach of fiduciary duty, which we allege, and where there is remedy sought – relief sought, rather, on behalf of the plan. And so where there is a fiduciary breach – But your theory that there's a fiduciary breach is just noncompliance with ERISA, so isn't it as broad as Judge Robinson just suggested? In this case, Your Honor, we do allege that the violation of the actuarial equivalence requirements is a fiduciary breach. The fiduciaries here have the ability to correct the plan and to correct any deficiencies or errors. And so we think here we do plausibly allege a fiduciary breach based on the violation of the actuarial equivalence requirements. How would that be different than any other alleged ERISA noncompliance? Well, for example, if a plan doesn't comply – if there's a benefit denial in which there's a violation of the claims processing rules, that doesn't necessarily rise to the level of fiduciary breach. And not every single ERISA violation is going to be a breach of fiduciary duty because you need to find that the person who's engaging in the misconduct is in fact acting in a fiduciary capacity and that they've violated the duties of prudence and loyalty. And that's not always going to be the case when there's something that – when there's an error. And so there's a reason why benefits claims, for example, are not always going to become breaches of fiduciary duty. So I think that – now, that said, Your Honor, I do think that where there's widespread ERISA violations, yes, those are going to give rise to fiduciary breach claims. And that's acceptable. That is what Congress authorized in 1109. What I'm really struggling with, though, is it's not just a fiduciary breach, but it's a fiduciary breach that causes a loss to the plan. And the loss here is a loss perhaps to every single individual, or at least every single individual who elects a joint survivor annuity. How is that an injury to the plan if they're not getting the money they're entitled to? So, Your Honor, I think that it's important to understand – I don't think that the injury to the plan is only a monetary injury. In other words, conceiving of the injury to the plan as being just that it has less money that it's entitled to would mean that what the court said in Russell, it didn't really mean, and I don't think that's right. What the court said in Russell is that if a plan administrator's refusal to play contractually authorized benefits had been willful and part of a larger systemic breach of fiduciary obligations, respondent in this hypothetical could have asked for removal of the fiduciary pursuant to 502A2. That's an instance where the plan would be keeping more money, right? And that would be a violation of ERISA. And there's a harm to the plan there because it's not doing what it's supposed to be doing. The reason for the plan's existence is so that it can be compliant with the law and pay benefits to participants and beneficiaries. Right, and I can – that language is sort of broad and dicta, but it also – let's assume it's right as to the 502A2 remedy or 503A2, sorry, whatever, 2 and 3, we'll just call them. As far as those remedies inured to the benefit of the plan, if you have a fiduciary that's white – administering the plan in a way that's full of widespread irregularities, you can see that that remedy helps the plan. It's less clear to me that that means that reformation designed to increase the benefits to the beneficiaries of the plan is a remedy to the plan. Your Honor, where the plan is acting illegally, I think that redressing that harm confers a benefit on the plan. The plan is not better off when it is illegally paying benefits just because it happens to be able to have more money as a result. That's not going to be a benefit to the plan. Now, the fact that – so, for example, imagine that there was a breaching fiduciary who's engaging in prohibited transactions but also have been making money for the plan. I don't think that any of us would say that the participant there doesn't have standing to have the fiduciary removed because they are engaging in rampant misconduct, even if it happens to result in more money flowing to the plan. Now, I think my friend's response is that, well, the plan just needs to have as much money as it's supposed to have. But the point here is that ERISA plans are better off when they are administered in a legal manner, when they are compliant with ERISA. That's a benefit. That's a concrete benefit that's conferred on the plan. And if you think that we have an arguable case here for that, then we have standing to seek remedies of reformation in joining the application of illegal plan terms. And if I may, Judge Nathan, I'd like to see if I can persuade you why restoration of losses to the plan is a remedy that we also have standing to seek. Here, unlike in Thole, Ms. Duke absolutely benefits from a favorable outcome. If the only remedy she was seeking was loss restoration, she could only get that if she could prove a violation of the AE requirements, the actuarial equivalence requirements. That's the only thing that would cause the court to award money to the plan. Armed with that judgment, she could go to the plan and demand a recalculation of her benefits. In other words, if she wins that remedy, then she has something that's of a concrete benefit to her. This is entirely distinguishable from Thole. The problem in Thole was that none of the remedies benefited the plaintiffs in a concrete way, whether they won or lost was irrelevant. Can you help me unpack that a little? Because I sort of assumed, I suppose, that the funding obligations flowed from the payment obligations rather than the other way around, that there's only a concern about the plan being underfunded if the plan now has to pay more to the individuals, and that the underfunding is calculated with reference to the plan's established obligations, not something else. I think my friend was distinguishing between the funding obligations, which do have to do with plan liabilities, but his point was that a sponsor could be overfunding a plan, and it isn't necessarily the case that there's not necessarily a connection, or he disputes the connection between the ERISA violations here and the funding of the plan. I think that the point is, or at least the point that I was trying to make, is that in a, and I believe I'm over time, Your Honor, I just realized that I had to run out of time. You might have noticed we're not paying that closely. I think the point here, Your Honor, is that a court would only award, a court could find a fiduciary breach and find that the plan sponsor was able to pay less into the plan than it would have had to pay. And if that's all the court found, if it said, okay, plan sponsor, you got to pay less than you would have otherwise if you had properly been calculating benefits, and I'm going to make you put into the plan the money that you should have been putting in all along, that judgment will be of concrete benefit to Ms. Duke because she can take that judgment, go to the plan, and say, recalculate my benefits. You've violated ERISA, it says it right here. It redresses her harm in the same way that a declaratory judgment would redress her harm. No one disputes that a judgment in that instance would be of concrete benefit to Ms. Duke. It's why she has the standing to seek all of the remedies that she's seeking because they all necessarily entail, if she wins, a holding that the actuarial equivalence requirements, which were applied to her, are illegal. Now, the injury here looks a lot like the injury in Laurent v. Pricewaterhouse. My plan's definition of normal retirement, use of certain interest rates and calculations, sought reformation of the plan. That was brought under A3. I take it your position is it could as easily have been brought under A2. Your Honor, I'm not exactly sure why the plaintiffs didn't allege it under A2 there, but I do think that where there is a widespread ERISA violation, I think possibly that Laurent could have been brought under A2. With apologies, I have to say, I'm not sure how individualized the violations were there. I think ours are sort of across the board and widespread. Well, this is a plan's definition of the normal retirement age and use of certain interest rate and calculations. I think that sounds plan-wide to me. Yeah, that's right, Your Honor. And I think that ERISA violations like that can be brought under A2. They weren't brought under A2 in that case, and this Court's holding that they're available under A3 doesn't say, doesn't automatically disqualify them from being available under A2. Just because a remedy can be sought under A3 doesn't mean that it can't also be sought under A2. Sure. So if you're right, and then this claim, and I'm thinking particularly about the claim from the reformation, if that could be brought under both sections, right? But in one section it's viewed as an injury to the plan, and in the other section it's viewed as an injury to the plan beneficiaries. I've got a couple of questions that flow from that. One is, how does that alter the analysis about the arbitrability? The injury in Cedeno didn't have a plausible alternative A3 path, or at least the Court didn't think it did. How does that change the arbitrability assessment? So, Your Honor, I think your question gets at, I think, a key difference between the remedy under A2 and the remedy under A3. Duke has the statutory right under A2 to proceed as a representative of the plan, which means the reformation she's seeking is at the plan level. Now, if she's proceeding under A3, the reformation can be individualized just to her. But under A2, she's obligated to be a representative of the plan. So it's reformation of the plan, but one is plan-wide at the plan level, which means it doesn't only benefit her, it benefits everybody, and it benefits the plan, which then has an indirect benefit of everyone else. But wasn't it important in Cedeno that it's not that any individual plaintiff has some sort of right to vindicate the interests of their counterparts? That wasn't what motivated the Court. It was that the gravamen of the claim, the essence of the claim, was that the plan itself had been injured, not that all of the beneficiaries. And I'm having a harder time figuring out how to apply that framework if it's both an injury to the plan and an injury to all the individuals at the same time. Right? Injury to the plan A2, injury to all the beneficiaries that we're going to treat as a plan-wide set of injuries A3. No? Well, so I might have sowed some confusion when I said, when I quickly answered that the reformation remedy is sort of identical under A2 and A3. I think that they're slightly different. I think reformation is available, but I think the scope of it is different under A2 and A3. Under A2, the reformation is of the plan, full stop, and that's a benefit to the plan because now the illegal plan terms have been excised from the plan, and the plan is in compliance with ERISA. That then creates a benefit down the road for other people, but let's set that to the side. We know that Duke has to show that there's an indirect benefit to her to satisfy Article III, and the fact that other participants might benefit is sort of beside the point. Under A2, the reformation could be she couldn't come into court, and because she's in arbitration or would need to be in arbitration, she would have to come in and ask for only reformation of the plan for her, only reforming the plan for her. Right, negative on A3. Yeah, under A3. And so the idea that the remedy is, and that's because A3 claims are brought in an individual capacity, and so they can be forced into individualized arbitration. They're not brought on behalf of the plan. The fact that ERISA is violated and is remediable under two separate provisions, we don't have to figure out whether it's only remediable under A2 or only remediable under A3. I think what's important is understanding the difference between the two provisions because of the arbitration question. Because this arbitration clause doesn't allow anyone to be a representative of the plan, it prohibits Duke from walking into the arbitration and saying, okay, let's reform the entire plan. Let's make sure these provisions never don't continue to exist. She can't do that because she's not allowed to be a representative, and that's exactly the effective vindication problem. It's the same one in Cedeno that caused the UDOC offense. Well, but in Cedeno, the effective vindication problem wasn't that the plaintiff couldn't achieve relief for all the other people in the world in the plan. It was that this was the proper and only mechanism for the plaintiff to achieve relief for the injury to the plan. And that's true here as well, Your Honor. Under A2, she can only get relief for the plan under A2. Under A3, in arbitration, she can only get relief for herself. She'd have to get a class action certified in order. A3 is not going to automatically give her the ability to get the plan-wide reformation, the reformation for herself. And that's their point is that she should be forced to only get an individualized remedy, one that benefits only her. I mean, that's completely contrary to what A2 is in ERISA for. So let's assume you're right that the claim that you're underpaying me and all the other beneficiaries because of the calculations that you've used, let's assume that that can proceed as an individual claim with relief solely for her in arbitration and simultaneously in court on a plan-wide basis. The actual arguments are identical essentially, right? You're looking at the same experts, the same calculations, the same this or that. How do we decide as a matter of sort of the bounds? Let's assume that it is discretionary on the part of the district court to decide whether to stay or to go forward. What does the identical composition of the issues tell us about how the district court ought to exercise that discretion or does it not tell us anything? The identity of the issues does bear on a district court's exercise of its discretion to stay the litigation pending completion of the arbitration. And I think had Luxottica appealed the district court's weighing of the discretionary factors that there might be sort of a serious conversation. We need to have a conversation about whether the district court balanced the factors correctly. I think that is a factor that weighs in ways that can weigh one way or the other. If there's extensive overlap, then if there's also a showing of prejudice, then there might be a strong argument for the exercise of a discretionary stay. Luxottica's argument though is that the stay should be mandatory. No questions asked. As soon as you find an issue that overlaps, every single claim that has that same issue, even if it's a non-arbitral claim, is subject to it, is automatically immobilized. Could you respond on that point to McAllen? It's a little hard to distinguish, so I appreciate your help in thinking about what McAllen teaches about the scope of a mandatory stay. Yeah, absolutely, Your Honor. So I think in McAllen, what the court did was examine whether or not there was a lawsuit against two parties, right? Against both Sears, and I'm going to blank on the name, of course, in this moment, and the critical defendant. And what the court held, what the plaintiff said was that, well, this second lawsuit, which is against two defendants, isn't really against the defendant that we entered into an arbitration agreement with. We're not really seeking anything from them, and so there really isn't a dispute here with that party. And the court disagreed and said that's not true. Even though you might not be seeking a money judgment against that party, the dispute is really against them. And you have to prove that they are liable in order for you to get a remedy against the other defendant in the case. So what the court held was that, essentially, there was an arbitrable claim that was being asserted against the defendant who had entered into the arbitration agreement. So it's of a piece with all of the cases that say where there's an arbitrable claim, that is subject to the mandatory stay. But where a claim is non-arbitrable, the stay is discretionary. The court expressly declined to address the question of whether Sears could invoke the mandatory stay or not. And the reason what the court said is that, as a practical matter, the whole lawsuit is stayed. And the reason the lawsuit was stayed as a practical matter is because the only basis for liability against Sears, the party against whom the non-arbitrable claim was asserted, it depended entirely on the claim against the party who entered into arbitration. I think, Your Honor, that in order for you to adopt Luxavica's position, you'd have to overrule Chang v. Lynn, as well as the Ginesco v. Kakiuchi case, because in both of those cases, there were claims that were asserted between the same parties where there was an arbitrable claim and a non-arbitrable claim. And in both of those cases, the court recognized that the stay of the non-arbitrable claim would be a discretionary stay, not a mandatory stay. And these are not cases where there was no overlap in the issues. To the contrary, there was certainly an overlap of issues in both of these cases. And so I don't think that you have the discretion here, really, to adopt Luxavica's position, because I think Chang v. Lynn and Ginesco create problems for you. And I think that McCowan is distinguishable. It is a case where, like in the—it's certainly less clear, Your Honor. But I think that it is still of a piece with those other cases where the court has said, where there's an arbitrable claim, that's subject to the mandatory stay. And the last thing I'll say on that point, Your Honor, is that I think that Luxavica's position would also require you to stay claims against parties where there's two plaintiffs in a case asserting claims against a defendant, and only one of the plaintiffs has entered into an arbitration agreement. You'd be forced to issue a mandatory stay against the plaintiff who's not in the— who doesn't have an arbitrable claim because they're not within the scope of the arbitration agreement. You'd have to do that as long as there's any overlap. That can't be the case. Imagine an accident involving passengers on a bus, and the driver and the passengers band together. The driver's bound by arbitration. The passengers are not. It can't—Congress didn't intend for that entire lawsuit to be stayed merely because one of the claims is arbitrable, at least as a mandatory matter. If Your Honors don't have anything further, thank you. Thank you. All right, I'm going to hold you to your three minutes this time. I appreciate that, Your Honor, and thank you for your indulgence earlier. I'll try and be quick. There are a few things that I want to try and convey. First, regarding the Laurent v. Price Waterhouse case, it is on all fours with this case in that it was another ERISA class action alleging actuarial equivalence issues. And, you know, you are correct, and counsel was correct, that the plaintiffs in that case asserted their claims under 1132A3, but this court, in its opinion, specifically said that part of the reason that that remedy of reformation was available under A3 is because without it, they would have no remedy under any other provision of ERISA. And you have to go through that analysis because of the Supreme Court's decision in Verity. So this court in Laurent considered and rejected the idea that this sort of issue would be a claim under A2 of the statute. It was necessary to the holding that it was available under A3 of the statute. I also want to point out that, you know, counsel said that every breach of fiduciary duty, essentially, is cognizable under 1132A2, but not a denied benefit claim. The problem, I think, is 1104, the ERISA fiduciary duty provisions, says one of your duties is to follow the plan terms to the extent consistent with ERISA, meaning every claim for benefits is also a claim on behalf of the plan for an injury to the plan in plaintiff's view. No different when you're alleging a statutory violation or a violation of plan terms because a violation of plan terms is a statutory violation all at the same time. Couldn't you distinguish a violation that's a violation writ large that affects all the beneficiaries versus an individual of choice? And that is not the analysis that applies under 1132A2 of the statute versus A3. You know this because Verity Court was plan-wide in the sense that it affected lots of participants. Cigna Court v. Amara involved a class of 20,000 participants. Laurent v. Price Waterhouse was a class action brought on behalf of thousands of participants. By contrast, the Supreme Court's decision in LaRue involved a single individual, but it involved an injury to the plan as distinct from an injury to the individuals and therefore was cognizable under A2 of the statute. Those other claims, Verity Court, Cigna Court v. Amara, Laurent, are all A3 claims because they flowed to the beneficiary. Two last things, Your Honor. One, Cedena. The arbitration provision in Cedena was important there because it had a blow-up provision which said if any part is not valid, then the entire arbitration is invalid and you have to go into court. This court has the opposite. This case has the opposite. The arbitration provision here says that to the extent that the arbitration provision is enforceable, you proceed in arbitration, and only to the extent it's not enforceable, you have to go to court. And so, for example, to the extent that counsel is claiming that she can seek the same relief for herself under A2 and A3, she has to do both of those in arbitration. And I want to address a couple of things that counsel said during her presentation about the remedies that she was seeking or potentially seeking. One was fiduciary removal, and I just want to address very clearly. Plaintiffs told the district court they weren't seeking that remedy. It's in joint appendix page 225 to 226. The court asked, you're not asking for removal of the fiduciary in this case? I don't see that. Counsel answered, we are not. That's correct. Counsel also told the district court that they were seeking the exact same remedies under A2 and under A3. This is at page 228 of the joint appendix. And so the notion that the reformation is different under A2 and A3 is certainly not what they told the district court to get to this point in time. Counsel said. Well, Anne, I know we're holding you to three minutes, but it could be that you can get reformation but a different kind of reformation, one being specific, another one being plan-wide. So that wouldn't be inconsistent, would it? Except she said that she was seeking the exact same remedies under A2, reformation and recalculation, the exact same reformation and recalculation, not different remedies that both fall under the same umbrella. I think we have your argument. Appreciate it. Thank you both. We'll argue on both sides. We will take this under advisement. Appreciate it. Thank you. We have one submission case today, 2231-65, United States v. Marcus Chambers. We will take that under advisement as well. And we have some counsel motions.